# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | : | Docket No.: 1:21-cv-11572-WGY |
| | : | |
| Plaintiff & Defendant-in-Counterclaim, | : | |
| | : | |
| -vs.- | : | |
| | : | |
| BAS HOLDING CORP., | : | |
| | : | |
| Defendant & Plaintiff-in-Counterclaim. | : | |
| | : | |

## PHILADELPHIA INDEMNITY INSURANCE COMPANY'S RESPONSE TO BAS HOLDING CORP.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Philadelphia Indemnity Insurance Company ("PIIC"), by and through its undersigned attorneys, submits the following *Response* to the *Statement of Material Facts* (ECF No. 29) made by BAS Holding Corp. ("BAS") in support of its *Motion for Summary Judgment* (ECF No. 27), pursuant to LR 56.1.

### PLAINTIFF'S STATEMENTS & ACCOMPANYING RESPONSES

1.　　Attached as *Exhibit 1* is a true and accurate copy of the Philadelphia Indemnity Insurance Company insurance policy number PHPOK2149023, with effective dates of June 27, 2020 to June 27, 2021 (the "Policy") which it issued to BAS Holding Corp. ("BAS").

**RESPONSE:  Denied in the form stated.  PIIC sold Policy No. PHPK2149023 to BAS, which was in force over the period from June 27, 2020, to June 27, 2021.  A true and accurate copy of the Policy is already in the record at ECF No. 1-1, as well as ECF Nos. 10-1 and 15-1.  Yet another copy of the Policy has been submitted as ECF No. 29-1.  Each of ECF Nos. 1-1, 10-1, 15-1, and 29-1 are identical, save only for the inclusion of certain Bates numbers in the lower left-hand corner of ECF No. 29-1.**

2.　　On March 17, 2021, a fire destroyed a building on the Brockton Fairgrounds that

was referred to as the "State Building." *See* Philadelphia's Complaint, attached as *Exhibit 2*, at ¶¶

10, 28; BAS' Answer to Philadelphia's Complaint, attached as *Exhibit 3*, at ¶¶ 10, 28.

> **RESPONSE:  Denied in the form stated.  The cited paragraphs do not stand for the propositions stated.  At ¶ 10, PIIC's *Complaint* alleged only that the Policy insures against the risk of fire damage to certain identified buildings located on the Brockton Fairgrounds; at ¶ 28, the *Complaint* alleged that a fire damaged a building located on the fairgrounds.  *See* ECF No. 1, ¶¶ 10, 28.  In response, BAS admitted that the Policy "insures against the risk of fire damage to buildings located at the Brockton Fairgrounds in Brockton, Massachusetts" but denied any factual allegations against BAS.  *See* ECF No. 10 (Answer), ¶¶ 10, 28.  BAS' answer overlooked PIIC's allegation that the Policy provides coverage only to "certain identified" buildings.**

> **PIIC agrees that the damaged building was the "State Building."  *See* ECF No. 1, ¶ 29; ECF No. 10 (Answer), ¶ 29.**

3.      At the time of the fire, BAS was insured pursuant to Philadelphia insurance policy

number PHPOK2149023, with effective dates of June 27, 2020 to June 27, 2021. *Ex. 1* at pg. 8.

> **RESPONSE:  Denied in the form stated.  The Policy bore No. PHPK2149023. Otherwise, agreed.**

4.      The Policy's "BUILDING AND PERSONAL PROPERTY COVERAGE

FORM" contains the following grant of coverage:

> **A. Coverage**
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> **1. Covered Property**
> Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.
>
> > **a. Building**, meaning the building or structure described in the Declarations, including:

*Ex. 1* at pg. 102.

> **RESPONSE: Agreed**.

5.      In the Policy's "Declarations," the section titled "DESCRIPTION OF

PREMISES" contains language stating, "SEE SCHEDULE ATTACHED." *Ex. 1* at pg. 26.

**RESPONSE:  Agreed.**

6.      The Policy provides liability coverage, but no property coverage, for building number 3. Property coverage is afforded for building numbers 1, 2, 4, 5, 6, and 7. *Id.* at pgs. 29 – 31.

> **RESPONSE:  Denied in the form stated.  The Policy provides coverage for what is shown on the *Locations Schedule* as "Bldg. No. 3" under the inland marine coverage part, because the location is an electrical generator.  *See* ECF No. 29-1, at 10, 29-31 & 52.  Otherwise, agreed.**

7.      The Policy contained a "COMMERCIAL PROPERTY COVERAGE PART SUPPLEMENTAL SCHEDULE" which describes the buildings Philadelphia agreed to insure under the Policy's property coverage as follows:

Policy Number: PHPK2149023
Named Insured: BAS Holding Corp.                                    Agent # 16880

**DESCRIPTION OF PREMISES:**

| Prem. No. | Bldg. No. | Location, Fire Protection/Construction and Occupancy |
|---|---|---|
| 0001 | 001 | 433 Forest Ave Brockton, MA 02301-5758 |
|  |  | AMUSEMENT PARKS-ENCLSD BLDGS |
|  |  | PC 01       MASONRY NON-COMBUSTIBLE |
| 0001 | 002 | 433 Forest Ave Brockton, MA 02301-5758 |
|  |  | FAIRGROUNDS-BLDG N/RESTAURANT |
|  |  | PC 01       FRAME |

*Ex. 1* at pg. 29.

Policy Number: PHPK2149023
Named Insured: BAS Holding Corp.                                    Agent # 16880

**DESCRIPTION OF PREMISES:**

| Prem. No. | Bldg. No. | Location, Fire Protection/Construction and Occupancy |
|---|---|---|
| 0001 | 004 | 433 Forest Ave Brockton, MA 02301-5758 |
|  |  | FAIRGROUNDS-BLDG N/RESTAURANT |
|  |  | PC 01       FRAME |
| 0001 | 005 | 433 Forest Ave Brockton, MA 02301-5758 |
|  |  | FAIRGROUNDS-BLDG N/RESTAURANT |
|  |  | PC 01       FRAME |

*Ex. 1* at pg. 30.

Policy Number: PHPK2149023
Named Insured: BAS Holding Corp.                                    Agent # 16880

**DESCRIPTION OF PREMISES:**

| Prem. No. | Bldg. No. | Location, Fire Protection/Construction and Occupancy |
|-----------|-----------|------------------------------------------------------|
| 0001 | 006 | 433 Forest Ave Brockton, MA 02301-5758 FAIRGROUNDS-BLDG N/RESTAURANT PC 01     FRAME |
| 0001 | 007 | 433 Forest Ave Brockton, MA 02301-5758 FAIRGROUNDS-BLDG N/RESTAURANT PC 01     FRAME |

*Id.* at pgs. 31.

> **RESPONSE: Agreed.**

8.     The Policy's "Locations Schedule" provides a further description of building 1 as the "Grandstand" and a further description of building 7 as the "Dwelling." *Ex. 1* at pg. 10.

> **RESPONSE: Agreed.**

9.     The Policy provides no further descriptions of buildings 2, 4, 5, and 6 other than the information set forth on pages 29 – 31. *Ex. 1.*

> **RESPONSE:  Disputed.  The Policy contains a *Locations Schedule* at page 10, a *Mortgagee Schedule* at page 11, a *Loss Payee Schedule* at page 12, and details about the coverage provided in the *Commercial Property Coverage Part Declarations* at pages 26-33.  It also contains a *Loss Payable Provisions* endorsement at pages 139-141.  *See* ECF No. 29-1.  All of those pages describe the buildings, and Buildings No. 2, 4, 5, and 6 are all described as being "frame" buildings.  *See id*.  Moreover, the Policy contains provisions that incorporate all representations made to PIIC by or on behalf of BAS, and BAS agrees that the Policy was issued in reliance upon those representations.  *See id*., at 194-95, 282 & 303.  Accordingly, the descriptions of the buildings furnished to PIIC merge into the Policy and supply the descriptions of the buildings, as well.**

10.     Attached as *Exhibit 4* is a true and accurate copy of the deposition transcript of Matthew Roberts, one of Philadelphia's two 30(b)(6) deponents, with redactions made to certain sections which Philadelphia has claimed are confidential.

> **RESPONSE: Agreed.**

11.     At no point has Philadelphia, either in its communications with BAS, its written

discovery responses, its pleadings, or its 30(b)(6) testimony argued that any of the terms of the Policy which described buildings 1 – 7 are ambiguous. *Ex. 1*; *Ex. 4*; Philadelphia's Answers to Interrogatories attached as *Exhibit 5*; Philadelphia's August 13, 2021 denial letter attached as *Exhibit 6*.

**RESPONSE:  Agreed.**

12.     The parties have not provided competing definitions of any of the Policy's descriptions of buildings 1 - 7 and have not suggested that any the language inof [*sic.*] the Policy which describes buildings 1 – 7 are susceptible to more than one meaning. *Ex. 1*; *Ex. 4*; *Ex. 5*; *Ex. 6*.

> **RESPONSE:  This statement is misleading and impermissibly vague, inasmuch as the term "competing definitions" is unclear.  PIIC has steadfastly maintained that the descriptions of Buildings No. 1-7 are as stated by Ward Bennett in his written communication to PIIC dated June 19, 2018, which was the basis for the statements of value that BAS signed in 2018, 2019, and 2020, and served as the grounds upon which PIIC decided to issue the Policy.  *See* ECF No. 32, ¶¶ 51-68; *accord* ECF No. 29-6.  BAS has adopted arguments of convenience, shifting its explanation of which buildings are insured under the Policy as the claim has progressed.**

13.     The parties agreed that the Policy provided property insurance coverage to several buildings on the Brockton Fairgrounds, located at 433 Forest Avenue, Brockton, MA and that the "State Building" was a building located on the Brockton Fairgrounds. *Ex. 2* at ¶¶ 10, 28, and 29; *Ex. 3* at ¶¶ 10, 28, and 29.

**RESPONSE:  Agreed.**

14.     Neither Philadelphia's Answer to Interrogatories nor its denial letter argue that the plain language of the Policy bars coverage for the claim. *Ex. 5*; *Ex. 6*.

> **RESPONSE:  Denied.  PIIC has consistently advised BAS that coverage for the fire is barred because the "State Building" was not insured under the Policy, because it was not identified or described thereon.  PIIC bases its position upon the written statements provided by Ward Bennett; the statements of value signed by George Carney in 2018, 2019, and 2020; and the terms of the Policy that merge the**

**application materials into the Policy itself.  *See* ECF No. 32, ¶¶ 51-68; ECF No. 29-5 at No. 14; ECF No. 29-6.**

**Moreover, in its disclaimer letter, PIIC advised BAS that the "State Building" is not listed on the *Locations Schedule* of the Policy.  *See* ECF No. 29-6.**

15.      Philadelphia's denial letter acknowledges the Policy's description of the insured properties being located at 433 Forest Avenue, Brockton, MA.

**RESPONSE:  Agreed.[1]**

16.      Philadelphia's 30(b)(6) witness testified as follows:

Q: [I]s there anything in the Policy which would lead you to the conclusion
that the State Building was not building no. 2, 4, 5, or 6 under the terms of the Policy?

A: No.

*Ex. 4* at pg. 39-40.

**RESPONSE:  Disputed.  Mr. Roberts testified that it was not reasonable to assume that the Policy insured the "State Building."  *See* ECF No. 29-4, at 39:2-40:4.**

17.      The parties agree that nothing in the Policy's language eliminates the State Building from coverage. *Ex. 4* at pgs. 39-40; *Ex. 5*; *Ex. 6.*

**RESPONSE:  Disputed.  PIIC has consistently advised BAS that coverage for the fire is barred because the "State Building" was not insured under the Policy, because it was not identified or described thereon.  PIIC bases its position upon the written statements provided by Ward Bennett; the statements of value signed by George Carney in 2018, 2019, and 2020; and the terms of the Policy that merge the application materials into the Policy itself.  *See* ECF No. 32, ¶¶ 51-68; ECF No. 29-5 at No. 14; ECF No. 29-6. Moreover, in its disclaimer letter, PIIC advised BAS that the "State Building" is not listed on the *Locations Schedule* of the Policy.  *See* ECF No. 29-6.  Mr. Roberts testified that it was not reasonable to assume that the "State Building" was insured.  *See* ECF No. 29-4, at 39:2-39:18.**

18.      The parties agree that the State Building fits within the Policy's grant of coverage.

*Ex. 2* at ¶¶ 10, 28, and 29; *Ex. 3* at ¶¶ 10, 28, and 29; *Ex. 4* at pgs. 39-40; *Ex. 5*; *Ex. 6.*

**RESPONSE:  Disputed.  The cited paragraphs do not stand for the propositions**

---

[1] PIIC assumes that this statement was meant to cite ECF No. 29-6, to comply with LR 56.1.  PIIC expressly relies upon ECF No. 29-6 to make this statement.

**stated.**

**At ¶ 10, PIIC's *Complaint* alleged only that the Policy insures against the risk of fire damage to certain identified buildings located on the Brockton Fairgrounds; at ¶ 28, the *Complaint* alleged that a fire damaged a building located on the fairgrounds. *See* ECF No. 1, ¶¶ 10, 28. In response, BAS admitted that the Policy "insures against the risk of fire damage to buildings located at the Brockton Fairgrounds in Brockton, Massachusetts" but denied any factual allegations against BAS. *See* ECF No. 10 (Answer), ¶¶ 10, 28. BAS' answer overlooked PIIC's allegation that the Policy provides coverage only to "certain identified" buildings.**

**PIIC admits that the damaged building was the "State Building" and that the "State Building" was located on the Brockton Fairgrounds, as that parcel is commonly known. *See* ECF No. 1, ¶ 29; ECF No. 10 (Answer), ¶ 29.**

**PIIC denies that the "State Building" fits within the Policy's grant of coverage. PIIC has consistently advised BAS that coverage for the fire is barred because the "State Building" was not insured under the Policy, because it was not identified or described thereon. PIIC bases its position upon the written statements provided by Ward Bennett; the statements of value signed by George Carney in 2018, 2019, and 2020; and the terms of the Policy that merge the application materials into the Policy itself. *See* ECF No. 32, ¶¶ 51-68; ECF No. 29-5 at No. 14; ECF No. 29-6. Moreover, in its disclaimer letter, PIIC advised BAS that the "State Building" is not listed on the *Locations Schedule* of the Policy. *See* ECF No. 29-6. Mr. Roberts testified that it was not reasonable to assume that the "State Building" was insured. *See* ECF No. 29-4, at 39:2-39:18.**

19.     On June 19, 2018, Ward Bennet, an employee of AssuredPartners sent an email to

Philadelphia in advance of Philadelphia's issuance of an insurance policy to BAS with a policy

period of June 27, 2018 to June 27, 2019. *Ex. 6* at pgs. 13 – 14; April 7, 2021, forwarding June

19, 2018 email and associated documents attached as *Exhibit 10*.

**RESPONSE:  Agreed.**

20.     BAS was not a party to that June 19, 2018 email. *Id.*

**RESPONSE:  Disputed. AssuredPartners was BAS' insurance broker. *See* ECF No. 32, ¶¶ 42-44. As the agent for BAS, AssuredPartners' e-mails to PIIC are the same as if they had been written by BAS itself, as a matter of law. Accordingly, it is a mischaracterization to state that BAS was not a party to the e-mail.**

21.     AssuredPartners was the broker/agent on the BAS account with Philadelphia. *Ex.*

*4* at pg. 97.

>    **RESPONSE:  Agreed: BAS was the insurance broker hired and retained by BAS to procure insurance coverage for BAS.**

22.     Mr. Bennett never spoken [*sic.*] with or communicated with anyone from BAS.

*See* Transcript of deposition of Ward Bennett attached as *Exhibit 7* at pg. 28.

>    **RESPONSE:  Disputed.  At the cited page, Mr. Bennett testified that he did not interact with Joe Cappucci, George Carney, or Chris Carney.  Mr. Bennett testified that the salesman on the account was Michael Vanderwerker, who traveled to the Brockton Fairgrounds and worked with BAS to identify the precise buildings to be insured and to prepare that information for PIIC.  *See* ECF No. 32, ¶¶ 43, 46-60.**

23.     Mr. Bennett's June 19, 2018 email stated, in part:

Building 1 the grand stand is approximately 25,000 square feet. Built in 1965. Updates electric, plumbing and electric in 2000.

Building 2 is the Brockton fair office. Built in 1970, and updated electric, plumbing and heating in 2008 there are 2 sections to the one store frame structure totaling 2000 square feet.

Building 4 is a building the fair uses for exhibits of poultry, and produce while the fair is running. It was built in 1960, and updated electric and plumbing 2000, and heating in 2006 approximately 850 square feet.

Building 5 is used for storage, was built in 1980, approximately 1,250 square feet. Recent heating update 2009

Building 6 is a restroom building built in 1965, and updated plumbing and electric in 2008. It is approximately 800 square feet.

*Ex. 6* at pgs. 13 – 14.

>    **RESPONSE:  Agreed.**

24.     Following the loss Philadelphia's independent adjuster, Samuel F. McCormack,

inspected the Brockton Fairgrounds and provided measurements and valuations of all the

buildings on the property to Philadelphia. *See* Samuel F. McCormack Co., Inc.'s April 15, 2021

report with attachments attached as *Exhibit 8*; Samuel F. McCormack Co., Inc.'s April 30, 2021

report with attachments attached as *Exhibit 9*.

> **RESPONSE:  Agreed, with qualifications as stated in this response.  PIIC assigned the adjustment of BAS' claim to the Samuel F. McCormack Co., Inc., at the request of BAS.  *See* ECF No. 29-4, at 171:4-15.  The name of the actual adjuster who performed the work was Andrew McCormack, not Samuel F. McCormack.  *See* ECF Nos. 29-8, at 2; 29-9, at 1.  By its terms, the report that is attached as *Exhibit 8* valued the buildings represented by the insured; the report that is attached as *Exhibit 9* provided square footage estimates and valuations for many of the buildings on the Brockton Fairgrounds.**

25.     Mr. Bennett describes the grandstand as being 25,000 square feet, but Philadelphia's adjuster has measured the grandstand as being 42,649 square feet. *Ex. 6* at pgs. 13 – 14; *Ex. 8* at pg. 6; *Ex. 9* at pg. 3.

> **RESPONSE:  Agreed.**

26.     Mr. Bennett describes the office at the Brockton Fairgrounds to be 2,000 square feet, but Philadelphia's adjuster has measured the office building to be approximately 2,959 square feet. *Ex. 6* at pgs. 13 – 14; *Ex. 8* at pg. 6; *Ex. 9* at pg. 3.

> **RESPONSE:  Agreed.**

27.     Mr. Bennett described the restroom as being 800 square feet, but Philadelphia's adjuster has measured the office building to be approximately 3,990 square feet. *Ex. 6* at pgs. 13 – 14; *Ex. 8* at pg. 6; *Ex. 9* at pg. 3.

> **RESPONSE:  PIIC agrees that Mr. Bennett described the restroom building (No. 6) as being approximately 800 square feet.  As to the rest of the statement, disagree: Mr. McCormack identified two restroom buildings located on the Brockton Fairgrounds, one of which measured approximately 3,990 square feet and one of which measured approximately 504 square feet.  *See* ECF No. 29-9, at 3, 9-16, 125-133.**

28.     Mr. Bennett describes a building used for storage as being 1,250 square feet, but there is no building on the property which fits that description. *Ex. 6* at pgs. 13 – 14; *Ex. 8* at pg. 6; *Ex. 9* at pg. 3.

**RESPONSE:  PIIC agrees that Mr. Bennett described a storage building (No. 5) as consisting of approximately 1,250 square feet.  As to the rest of the statement, disagree: Mr. McCormack identified a storage shed of approximately 2,500 square feet on the Brockton Fairgrounds (Mr. McCormack's Location No. 32),** *see* **ECF No. 39-9 at 3, which contained a heating system and was constructed around 1970.  *See id.*, at 212-216.  What Mr. McCormack identified as his "Location No. 32" matches what BAS' broker, Michael Vanderwerker of AssuredPartners Northeast LLC, identified as storage building No. 5.  *See* ECF No. 32, at ¶¶ 50-52.**

29.     Following the loss, Jessica Dolce, the underwriter who handled the BAS account and one of Philadelphia's 30(b)(6) witnesses, located Ward Bennet's June 19, 2018, email and forwarded it to herself on April 7, 2021. *See* April 7, 2021, forwarding June 19, 2018 email and associated documents attached as *Exhibit 10*.

**RESPONSE:  Agreed.**

30.     Jessica Dolce, the underwriter associated with the BAS account, and Matthew Roberts, the Philadelphia employee who ultimately denied the claim, located Ward Bennett's June 19, 2018 email by no later than April 8, 2021. *See Ex. 10*; Jessica Dolce's April 8, 2021, email attached as *Exhibit 11*; *Ex. 4* at pg. 14.

**RESPONSE:  Agreed.**

31.     However, in her email of April 8, 2021, Jessica Dolce did not rely on Ward Bennett's email to reach her conclusion that the State Building was not insured under the terms of the Policy. *Ex. 11*.

**RESPONSE:  Disputed.  Ms. Dolce's electronic mail was an internal communication with PIIC, and she clearly stated at her deposition that her conclusion that the "State Building" was not insured under the Policy was based upon a review of the applications and statements of value in the file.  *See* ECF No. 29-11.  At her deposition, Ms. Dolce testified that the descriptions of the buildings provided by Mr. Bennett were material to what specific buildings PIIC insured.  *See* ECF No. 32, ¶¶ 64, 66, 68 & 70.**

32.     Mr. Roberts did not even review the June 19, 2018, despite the fact that it had been provided to him by Ms. Dolce, until "counsel found" the June 18, 2018. *Ex. 4* at pgs. 106 –

107.

> **RESPONSE: Disputed. This statement is an argument, not a statement of fact, and therefore is not properly before the court. *See* LR 56.1. The statement is also unintelligible. PIIC agrees that Mr. Roberts testified that he had not reviewed Mr. Bennett's e-mail as of April 8, 2021.**

33.    Attached as *Exhibit 12* is a true and accurate copy of portions of the deposition transcript of Jessica Dolce, one of Philadelphia's two 30(b)(6) deponents, with redactions made to certain sections which Philadelphia has claimed are confidential.

> **RESPONSE: Agreed.**

34.    From the date of her April 8, 2021, email up until the date of her deposition, neither Ms. Dolce, nor anyone in the Philadelphia underwriting department was involved in the adjustment of the claim. *Ex. 12* at pgs. 20, 60-61.

> **RESPONSE: Disputed. Ms. Dolce testified that she was not involved in the adjustment of the claim, but that Nancy Juvennelliano was. *See id*., at 60:17-23.**

35.    Accordingly, neither Ms. Dolce nor anyone in the underwriting department ever discussed the potential impact of Mr. Bennet's June 19, 2018, email on the underwriting of the Policy prior to Philadelphia's August 13, 2021 denial of the claim. *Ex. 12* at pgs. 20, 60-61.

> **RESPONSE: Disputed. Ms. Dolce testified that the underwriting of the Policy was based upon Mr. Bennett's e-mail, which provided descriptions and other required information about the insured buildings. *See* ECF No. 32, ¶¶ 64-68. She expressly stated that PIIC was never asked to insure the "State Building" and that, therefore, PIIC did not insure that building. *See id*., ¶¶ 70-71. Ms. Dolce stated the same to Mr. Roberts, as BAS admits. *See* Statements & Responses No. 29-31 above.**

36.    Philadelphia provided an "Expiring Coverage Report" to AssuredPartners on February 25, 2020 – four months before it issued the Policy- and requested that AssuredPartners "please note any changes that may apply." See February 25, 2020 email chain with attachments attached as *Exhibit 13*.

> **RESPONSE: The statement in the form presented is misleading. PIIC sent a notice**

**to AssuredPartners on February 25, 2020, stating that Policy No. PHPK2001841 would be expiring on June 27, 2020, and provided a renewal survey so that PIIC could provide BAS with a timely renewal proposal.** *See* **ECF No. 29-13, at 2.**

37.     The "expiring coverage report," like the Policy itself, listed Building number 1 as the grandstand, Building number 7 as the dwelling, and provided no substantive description of buildings 2, 4, 5, or 6. *Ex. 13* at pgs. 7 – 9.

**RESPONSE:  Disputed.  It is not clear what BAS means by a "substantive description" of buildings 2, 4, 5, or 6, but each building has an attached statement about the specific amount of insurance desired thereon.** *See id.* **BAS' statement also overlooks that the e-mail dated February 25, 2020, was addressed to the same individual, Ward Bennett, who previously described each building to PIIC.** *See id.,* **at 1-2.**

38.     On April 29, 2020, Philadelphia again wrote to AssuredPartners and requested that a "Signed/Dated Statement of Values (SOV)" be submitted in advance of the issuance of the Policy. *See* April 29, 2020 email and attachements [*sic*.] thereto attached as *Exhibit 14*.

**RESPONSE:  Agreed.**

39.     Philadelphia attached a "quote" to its April 29, 2020 email. *Ex. 14* at pg. 1.

**RESPONSE:  Agreed, although the document is formally captioned "***Proposal for Insurance***" and is dated April 24, 2020.** *See* **ECF No. 29-14, at 5.**

40.     That quote, like the Policy, described building number 1 as the grandstand, building number 7 as the dwelling, and identified buildings 2 – 6 only by the address of 433 Forest Ave, Brockton, MA. *Ex. 14* at pg. 10.

**RESPONSE:  Agreed in part.  At page 10, the** *Proposal for Insurance* **included a** *Location Schedule* **that is as stated.  The** *Proposal***, however, expressly stated that it was based upon the expiring coverage and exposure, and required both a signed and dated statement of values** **and** **confirmation that there were no changes in the exposure – that is, that the buildings to be insured remained as they were on the expiring coverage (***i.e.***, the 2019-2020 policy).** *See* **ECF No. 29-14, at 1-2 & 6-7.  The** *Proposal* **further described the buildings to be insured by limits of insurance requested.** *See id.***, at 17.**

41.     On June 18, 2020, AssuredPartners provided a summary of Philadelphia's

proposal of insurance to BAS. *See* June 18, 2020 proposal by AssuredPartners to BAS regarding

offer by Philadelphia attached as *Exhibit 15*.

     **RESPONSE:  Agreed.**

     42.    That proposal mirrored the information set forth in the Expiring Coverage Report

and "quote" which Philadelphia had provided to AssuredPartners in the months prior, and again

did not list any ages, square footage, or latest updates to the buildings. *Ex. 15* at pg. 4 - 5.

     **RESPONSE:  Objection: Relevance.  The substance of any communication between
AssuredPartners – the broker chosen by BAS to act as its agent – and BAS is strictly
a matter between AssuredPartners and BAS.  It has nothing to do with the issues in
dispute in this action, and therefore is neither admissible, *see Fed. R. Ev.* 402, nor
properly before the Court on this motion.  *Fed. R. Civ. P.* 56(c)(2).**

     **Notwithstanding the foregoing, disputed.  The proposal prepared by
AssuredPartners for BAS described the scheduled locations in detail, by name and
by limits of coverage sought, as well as the basis for valuation (replacement cost).
*See* ECF No. 29-15, at 4-5.  The expiring limits of coverage and the renewal limits
being sought for all buildings were identical.  *See id*.**

     **PIIC agrees that the proposal provided as *Exhibit 15* does not include building ages,
square footage, or information about updates to the buildings.**

     43.    AssuredPartners also provided BAS with a filled out, but not signed, copy of the

Statement of Values form, which described the buildings in the manner set forth above, but did

not request any BAS [*sic.*] to aver as to the age, square footage, or recent updates to any of the

buildings. *Ex. 15* at pg. 18.

     **RESPONSE:  Agreed.  The column showing "100% values" for each entry shows
the same figures set forth in the proposal.  *Compare id*., at 5, *with id*., at 18.**

     44.    BAS signed the Statement of Values associated with the Policy on June 23, 2020

and it was provided to Philadelphia on June 24, 2020. *See* June 24, 2020 email chain providing

signed statement of value to Philadelphia attached as *Exhibit 16* at pgs. 1 – 2 and 86.

     **RESPONSE:  Agreed.**

45.     After receipt of the Statement of Values associated with the Policy, Philadelphia issued the Policy. *See Ex. 1.*

**RESPONSE:  Agreed.**

46.     At no point during its communications with AssuredPartners related to the issuance of the Policy did Philadelphia request that BAS confirm or provide any information regarding the age, square footage, or latest utility updates to any of the building that were to be insured under the Policy.  *Exhs. 13*, *14*, *15*, and *16*.

> **RESPONSE:  Disputed.  *Exhibit 15* is not properly before the Court.  *See Fed. R. Ev.* 402; *Fed. R. Civ. P.* 56(c)(2); Response No. 42 above.**
>
> **The formal *Proposals for Insurance* issued by PIIC both stated, expressly, that they were conditioned upon there being no changes in the exposures listed – that is, they were based in express reliance upon the expiring coverage and exposure.  *See* ECF No. 29-14, at 6-7; ECF No. 29-16, at 12-13.  The proposals, and the statements of value, listed the amounts of insurance requested as identical to the expiring coverage.  *See id*.**
>
> **Ms. Dolce testified that the property descriptions furnished by Mr. Bennett in June 2018 were expressly relied upon to issue the policies in June 2018, June 2019, and June 2020 – the last of which is the Policy.  *See* ECF No. 32, ¶¶ 61-68.**

47.     At no point during its communications with AssuredPartners related to the issuance of the Policy did Philadelphia request any further description of the buildings other than those set forth in the expiring coverage report or statement of values. *Exhs. 13*, *14*, *15*, and *16*.

> **RESPONSE: Disputed.  *Exhibit 15* is not properly before the Court.  *See Fed. R. Ev.* 402; *Fed. R. Civ. P.* 56(c)(2); Response No. 42 above.**
>
> **The formal *Proposals for Insurance* issued by PIIC both stated, expressly, that they were conditioned upon there being no changes in the exposures listed – that is, they were based in express reliance upon the expiring coverage and exposure.  *See* ECF No. 29-14, at 6-7; ECF No. 29-16, at 12-13.  The proposals, and the statements of value, listed the amounts of insurance requested as identical to the expiring coverage.  *See id*.**
>
> **Ms. Dolce testified that the property descriptions furnished by Mr. Bennett in June 2018 were expressly relied upon to issue the policies in June 2018, June 2019, and**

**June 2020 – the last of which is the Policy.** *See* **ECF No. 32, ¶¶ 61-68.**

48.     Philadelphia's 30(b)(6) witness testified that that the over 17,000 square foot discrepancy between Ward Bennett's description of the Grandstand and the actual size of the grandstand would make no difference in whether the Grandstand was insured under the policy. *Ex. 4* at pg. 138.

**RESPONSE:  Agreed.**

49. Philadelphia's 30(b)(6) witness testified that, despite the over 3,000 square foot discrepancy between Ward Bennet's description of the restroom and the actual size of the restroom, coverage would be afforded for the restroom if it suffered a loss. *Ex. 4* at pg. 143.

**RESPONSE:  Agreed, but subject to the qualification that Mr. McCormack's report listed two different restroom buildings on the Brockton Fairgrounds, one of which is shown as being 504 square feet.  *See* ECF No. 29-9, at 3.**

50.     The policy's Vacancy Condition states:

**VACANCY OR UNOCCUPANCY**

If the building where loss or damage occurs, whether intended for occupancy by owner or tenant, has been vacant or unoccupied for more than:

**1.** 60 consecutive days for residential premises of 3 units or less; or

**2.** 30 consecutive days for all other premises;

immediately before that loss or damage, we will not pay for the loss or damage.

A building is vacant when it does not contain enough business personal property to conduct customary operations.

*Ex. 1* at pg. 120.

**RESPONSE:  Agreed.**

51.     The Policy does not define the term "customary operations." *Ex. 1.*

**RESPONSE:  Agreed.**

52.     It is undisputed that BAS stored a litany of materials used for the Brockton Fair in the State Buliding [*sic.*], at all relevant times, up to the date of the fire. *See* Transcript of

examination under oath of BAS (with redactions for personal identifying information) attached as *Exhibit 18* at pgs. 26, 29, 30, 32, 34, 51, 54; BAS' Answers to Philadelphia's First Set of Interrogatories at *Exhibit 19* at answers 10 and 11; BAS' Answers to Philadelphia's Second Set of Interrogatories attached as *Exhibit 20* at answers 1, 2, and 3; Portions of the deposition of Bob Carney attached as *Exhibit 21* at pgs. 19-20 (indicating that the materials were stored in the open space in the State Building to the right hand side); March 26, 2021 report of Samuel F. McCormack to Philadelphia attached as *Exhibit 17* at pgs. 58 – 61 (showing remnants of materials stored in the State Building after the fire); *Ex. 4* at pgs. 72 – 74 (Philadelphia acknowledging presence of building materials and barrels in the post-loss photographs).

> **RESPONSE:  Agreed that, at the time of the fire, BAS had placed an unknown but limited quantity of trash barrels, signage, and temporary fencing in the "State Building" – which BAS was not able to particularize.  *See* ECF No. 29-18, at 32:5-13; No. 29-19, at 8-9 (Response No. 11).**

53.    Brian Ferreira, an employee of Carney Trucking Co., who performed maintenance at the Brockton Fairgrounds, had been in the State Buliding [*sic*.] within a month or so before March 17, 2021. *Ex. 20* at answer number 3.

> **RESPONSE:  Agreed.**

54.    Philadelphia has agreed that so long as materials were stored in a storage building, that building would be occupied under the terms of the Policy. *Ex. 4* at pg. 148.

> **RESPONSE:  Agreed, with the proviso that PIIC did not testify in the abstract. Attorney Reilly's question was specifically limited to "the" storage building disclosed as Building No. 5 on the statement of values used to underwrite the Policy. *See id*.**

55.    Philadelphia has agreed that so long as a building is occupied for its intended purpose, it would be considered occupied under the terms of the Policy. *Ex. 4* at pg. 148.

> **RESPONSE:  Denied.  Mr. Roberts' testimony was as follows:**

**Mr. Reilly:**    If materials are stored in the store building, is the building occupied?

**Mr. Roberts:  I would say it's occupied for its intended purpose then, correct.**

*See* **ECF No. 29:4, at 148:10-17.   BAS' characterization distorts Mr. Roberts' testimony by suggesting agreement with an abstract proposition that he was never asked about.**

56.     Philadelphia's 30(b)(6) underwriting deponent agreed that, with respect to a storage building, Philadelphia would consider such building occupied if it was regularly used for storage and would not expect work to be conducted out of such a building. *Ex. 12* at pg. 138 – 139.

**RESPONSE:  Agreed.**

57.     Philadelphia agreed that "[a]s long as the building was being used for storage, that would be the occupancy which Philadelphia would expect for a building described a storage building." *Ex. 12* at pg. 139.

**RESPONSE:  Agreed.**

58.     The Policy's examination under oath condition states as follows:

> **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

*Ex. 1* at pg. 112.

**RESPONSE:  Agreed.**

59.     The Policy also states that "[t]he insured, as often as may be reasonably required, shall… submit to examinations under oath." *Ex. 1* at pg. 124.

**RESPONSE:  Agreed.**

60.     On August 3, 2021, BAS appeared for its examination under oath and answered all questions asked of it. *Ex. 18*.

> **RESPONSE:   Although Susan Rodrigues appeared as BAS' examinee and she answered all questions put to her truthfully, she conceded that she was unable to explain which vendors or groups exhibited displays inside the "State Building"; how the statements of value were calculated; what had been done to maintain the "State Building" over the years; or what was stored in it.   *See* ECF No. 29-18; *accord* ECF No. 32, ¶ 84 (citing transcript at pp. 26:1-28:11, 30:11-17, 34:10-15, 42:7-44:3, 45:3-6, 45:20-46:6, 49:15-51:22).  Accordingly, she was unable to answer the questions put to her substantively, which impeded the investigation of the loss.**

61.     On August 4, 2021, Philadelphia wrote to BAS' counsel and requested to take "examinations under oath" of six specific individuals. See August 4, 2021 email of David Zizik attached as *Exhibit 22*.

> **RESPONSE:  Agreed.**

62.      Philadelphia's 30(b)(6) witness conceded that the Policy does not authorize Philadelphia to "select which individual appears on behalf of BAS Holding." *Ex. 4* at pg. 152.

> **RESPONSE:  Agreed.**

63.     In its 30(b)(6) deposition, Philadelphia conceded that the Policy does not authorize Philadelphia to take depositions of people that were not the "insured." *Ex. 4* at pg. 152.

> **RESPONSE:  Denied.  The testimony was:**

> **Mr. Reilly:     [I]s there anything in that paragraph which authorizes Philadelphia to select which individual appears on behalf of an insured?**

> **Mr. Roberts: It says we may examine any insured.**

> ***See* ECF No. 29-4, at 151:6-19.  BAS' statement suggests a fact to which Mr. Roberts did not testify, and it overlooks that BAS' designee identified Messrs. Vaz, Gerry, Carney, and Ferreira as the most knowledgeable about the use of the State Building, what was stored there, and its upkeep.  *See* ECF No. 32, ¶ 85.**

64.     Prior to issuing its August 13, 2021 denial, Philadelphia's counsel never informed Philadelphia that BAS' objections were based, in part, on BAS' position that Philadelphia was

not permitted to take EUOs of individuals who were not employees of BAS. *Ex. 4* at pg. 158 –

159.

> **RESPONSE:  PIIC asserts the attorney-client privilege over any communications between its counsel and any of its representatives or designees, with the result that this statement is not properly before the Court.**
>
> **To the extent required, PIIC further objects to this statement on grounds of relevance.  *See Fed. R. Ev.* 402; *Fed. R. Civ. P.* 56(c)(2).**
>
> **The statement by BAS mischaracterizes Mr. Roberts' testimony.  Attorney Reilly asked him: "And were you aware that part of the basis for BAS's objection was that many of the individuals for which Philadelphia sought an EUO were not employees of BAS?"  *See* ECF No. 29-4, at 158:21-24.  Mr. Reilly never asked Mr. Roberts about the substance of communications with PIIC's attorney, with the result that the statement is a legal conclusion and not a statement of fact.**
>
> **The statement, moreover, omits what the question asked and impermissibly suggests that PIIC invoked its rights to take examinations inadvisedly, when in fact it was Ms. Rodrigues who identified the individuals.  The statement also overlooks the fact that PIIC asked to examine George Carney, BAS' president and chief executive officer.  *See* ECF No. 29-22.**

65.    BAS responded to Philadelphia's August 4, 2021, request for six additional

examinations under oath on August 9, 2021. *See* BAS' August 9, 2021, response to Philadelphia

attached as *Exhibit 23*.

> **RESPONSE:  Agreed.**

66.    BAS' August 9, 2021, correspondence informed Philadelphia that it was not

permitted to demand the examinations under oath of the six specific individuals identified by

Philadelphia for the reasons noted above. *Ex. 23*.

> **RESPONSE:  Denied.  The written document speaks for itself.  An adversarial document, it contended across six pages that PIIC's questioning was intended to annoy, oppress, or serve as a fishing expedition that searched to manufacture grounds to deny the claim, rather than to investigate the loss.  *See* ECF No. 29-23, at 6.  PIIC agrees that, among other reasons, the letter made the point that five of the individuals sought to be examined were not insureds, nor officers nor employees of BAS.  PIIC cannot determine what BAS means by "for the reasons noted above" in this statement.**

67.     BAS stated to Philadelphia's counsel that if Philadelphia identified the factual basis upon which it had reserved its rights and stated why a further examination under oath was "reasonably required," as required under the Policy's language, BAS would respond further to Philadelphia request for examinations under oath. *Ex. 23* at pg. 6.

> **RESPONSE:  Agrees only that the letter states: "Notwithstanding the above, if Philadelphia identifies the factual basis upon which it has reserved its rights, and states why a further examination under oath is 'reasonably required,' BAS will consider such request and respond further."  *See id*.  The letter does <u>not</u> state that BAS would respond further to the request for an examination under oath.**

68.     BAS' position regarding its willingness to proceed with further examinations under oath if Philadelphia identified why such further examinations under oath were "reasonably required" was also never communicated to Philadelphia by its counsel. *Ex. 4* at pg. 158.

> **RESPONSE: PIIC asserts the attorney-client privilege over any communications between its counsel and any of its representatives or designees, with the result that this statement is not properly before the Court.**
>
> **To the extent required, PIIC further objects to this statement on grounds of relevance.  *See Fed. R. Ev.* 402; *Fed. R. Civ. P.* 56(c)(2).**
>
> **The statement by BAS mischaracterizes Mr. Roberts' testimony.  Attorney Reilly conceded on the record that PIIC asked for the additional examinations under oath, that he objected, that there was a re-request for the examinations, and that the claim was denied thereafter.  *See ECF No. 29-4*, at 157:18-23.  Mr. Roberts testified that he understood that BAS would not testify under oath further, and that BAS had rejected the request to produce additional individuals for examination.  *See id*., at 158:9-16.  When asked specifically if he had seen Attorney Reilly's letter of August 9, 2021, Mr. Roberts testified that he did not know.  *See id*., at 159:2-6.**

69.     On August 10, 2021, Philadelphia responded to BAS and refused to identify the factual basis upon which it had reserved its rights or provide any substantive responses to BAS' objections based on the Policy language and case law. *See* August 10, 2021 email of David Zizik attached as *Exhibit 24*.

> **RESPONSE:  Agreed that PIIC responded to BAS' letter of August 9, 2021, on August 10, 2021, and that a true copy of that response appears at ECF No. 29-24.**

**The document is in writing and speaks for itself.**

**As to all other parts of the statement, denied.  The response explained the deficiencies in Ms. Rodrigues' testimony and further explained that there was a genuine issue as to whether the "State Building" was even covered under the Policy and, if it were, there was a further issue about whether coverage would be excluded because the building was vacant and unoccupied.  *See id.*  PIIC asked BAS to furnish factual support for its position that the "State Building" was covered under the Policy.  *See id.*, at 2.**

70.    Philadelphia's August 10, 2021, correspondence re-noticed the examinations under oath of for August 19, 2021. *Ex. 24*.

**RESPONSE:  Denied.  The correspondence requested that the additional witnesses appear on August 19 and August 20, and offered multiple other dates.  *See* ECF No. 29-24, at 2.**

71.    On August 13, 2021 Philadelphia denied the Claim. *Ex. 6. See* August 13, 2021, denial letter attached as *Exhibit 10*. As a result of Philadelphia's denial of BAS' claim **before** the EUOs were scheduled to take place, and in light of the fact that BAS did not fail to attend a single scheduled EUO, Philadelphia waived any right to enforce the Policy's post-loss conditions, including the condition requiring BAS to submit to examinations under oath. BAS did not breach the Policy's examination under oath condition.

**RESPONSE:  As to the first sentence, agreed.  ECF No. 29-6 is a copy of the denial letter.  ECF No. 29-10 is not the denial letter, and it appears to be a stray reference.**

**As to the second and third sentences, denied.  These sentences are not statements of fact but instead are conclusions of law, which are not permitted under LR 56.1 and therefore require no response.  Legal argumentation is restricted to the memorandum of law, and this point is addressed in more detail therein.  As shown above, BAS refused to, and in fact did not, appear for the examinations and therefore may not rely upon formalistic argumentation to claim waiver.  Through its scorched-earth approach to this litigation, it breached the Policy's examination-under-oath condition.  *See* ECF No. 33, at 20-21 (Memo pp. 15-16 – Argument III).**

72.    The Policy's Coinsurance condition is set forth in the Policy's "Additional Conditions" and states in relevant part:

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

*See Ex. 1* at pg. 114.

> **RESPONSE: Agreed, inasmuch as the Policy's coinsurance condition commences with the cited language, but it continues thereafter at considerable length to define the condition.** ***See id***., **at 114-115.**

73.     The "Limit of Insurance" for the building coverage is $2,349,908, and the "Coinsurance percentage shown for it in the Declarations" is 90%. *Ex. 1* at pg. 33.

> **RESPONSE: Agreed.**

74.     So long as the "value of the Covered Property at the time of the loss" is not greater than $2,611,008.89 the Coinsurance penalty does not apply. *Ex. 1* at pg. 33.

> **RESPONSE: Agreed.**

75.     The Policy does not define the phrase "the value of Covered Property at the time of loss." *Ex. 1*.

> **RESPONSE: Disputed. The Policy sets forth, at length, various provisions about how to ascertain the value of Covered Property, which itself is a defined term (*see* ECF No. 29-1, at 102-103). The "valuation" clause defines how the "value of Covered Property in the event of loss or damage" is calculated. *See* ECF No. 29-1, at 113-114 (Section E.7); *see also id*., at 116-117 (stating that "replacement cost" is used instead of "actual cash value" throughout the form); *accord id*., at 29-31 (identifying all buildings on the Policy as being insured on a "replacement cost" basis).**

76.     Philadelphia has admitted that the "value of the property at the time that the covered cause of loss causes the damage" is the "actual cash value" of the property. *Ex. 4* at pgs.

110, 112, and 119 - 120.

> **RESPONSE:  Disputed.  In response to a direct question on this point, Mr. Roberts testified as follows:**

> **Mr. Reilly:     So the actual cash value is the value of the covered property at the time of loss; is that right?**

> **Mr. Roberts:  No, I wouldn't say it's the value of the covered property.  It's the replacement cost of the [property] less depreciation at the time of loss.**

> ***See* ECF No. 29-4, at 110:21-111:2; *accord* 112:8-16 (Mr. Reilly defining "actual cash value" as "replacement cost less depreciation" in his question).**

77.     Philadelphia agrees that if they were "to calculate the value of covered property at the time of loss… the appropriate measure" would "be actual cash value." *Ex. 4* at 119-120.

> **RESPONSE:  Agreed, with the proviso that "actual cash value" was defined in the questioning as "replacement cost less depreciation."  *See id*., at 112:8-16.**

78.     BAS has made a claim for the actual cash value of the state building. *Ex. 19* at Answer number 13.

> **RESPONSE:  Agreed that BAS has asserted the actual cash value of the damage to the "State Building" as one element of its damages in this case.  *See id*.**

79.     The only evidence of "actual cash value" of the properties at the Brockton Fairgrounds which Philadelphia has produced in discovery are (1) the McCormack repair estimate for the State Building, attached hereto as *Exhibit 25*, and (2) McCormack's calculations of the actual cash values of the buildings on the Brockton Fairgrounds. *Ex. 9*.

> **RESPONSE:  Denied.  In lieu of reference, the parties have stipulated that the "actual cash value" of the "State Building" is $1,377,302, and the "replacement cost value" is $2,103,044.  *See* Henlin Dec., Ex. V (filed herewith).  Accordingly, it is misleading for BAS to characterize the "only evidence" of "actual cash value" as being what was exchanged in discovery.**

> **Agreed that *Exhibit 25* is an estimate prepared by the Samuel F. McCormack Co. that states an "actual cash value" for the "State Building" of $1,026,483.15.  *See* ECF No. 29-25, at 18.  The exhibit also sets forth a "replacement cost value" for the building of $2,139,596.22.  *See id*.**

*Exhibit 9*, like *Exhibit 8*, states replacement-cost valuations. *See* ECF No. 29-8, at 1 & 6; ECF No. 29-9 at 1, 3 & *passim*. It is agreed that *Exhibit 9* does contain "actual cash value" figures for each building, too, on the analysis pages for each building.

80.     Utilizing that evidence created and produced by Philadelphia, the "value of covered property at the time of loss," *e.g.* the "actual cash value" for the 6 buildings which Philadelphia's contends are insured totals $1,572,223.49, which is over $1,000,000 below the limit of insurance and therefore does not trigger the coinsurance penalty. *Ex. 9* at pgs. 4, 9, 17, 154, 229, 294; *Ex. 4* at pgs. 120 – 121.

> **RESPONSE:  Agreed that the sum of the "actual cash value" figures specified in this statement is $1,572,223.49.  The clause about this sum being "over $1,000,000 below the limit of insurance and therefore does not trigger the coinsurance penalty" is a legal conclusion and not a statement of fact, and is therefore not properly before the court pursuant to LR 56.1, so no response thereto is required.**
>
> **The total value of the six buildings highlighted in grey is $5,998,530.66.  *See* ECF No. 29-8, at 6; *accord* ECF No. 29-9, at 3.  PIIC does not contend that all six of those buildings are insured, and expressly testified that the buildings marked in grey are based on the reports it received from BAS.  *See* ECF No. 29-4, at 114:15-118:7.  A coinsurance penalty applies to this dispute because BAS bought coverage that applies on a replacement-cost basis.  *See* ECF No. 29-4, at 118:24-119:1; *accord* ECF No. 29-1, at 29-31.**

81.     Specifically, Philadelphia's adjuster estimated the actual cash value of the insured properties as follows:

| | |
|---|---|
| Grandstand: | $589,573.52 |
| Office: | $154,243.84 |
| Restroom: | $ 62,715.21 |
| Dwelling: | $112,537.97 |
| State Building: | $595,783.25 |
| Exhibit Building: | $ 57,369.70 |
| **TOTAL:** | **$1,572,223.49** |

*Ex. 9* at pgs. 4, 9, 17, 154, 229, 294; *Ex. 4* at pgs. 120 – 121.

> **RESPONSE:  Agreed that the sum produced by the specified figures is accurate, but denies that those are the values that should be used to calculate the coinsurance requirement, because the total value of the six buildings highlighted in grey is**

**$5,998,530.66.  *See* ECF No. 29-8, at 6; *accord* ECF No. 29-9, at 3.  PIIC does not contend that all six of those buildings are insured, and expressly testified that the buildings marked are based on the reports it received from BAS.  *See* ECF No. 29-4, at 114:15-118:7.  A coinsurance penalty applies to this dispute because BAS bought coverage that applies on a replacement-cost basis.  *See* ECF No. 29-4, at 118:24-119:1; *accord* ECF No. 29-1, at 29-31.**

82.     McCormack created a second estimate of the State Building in advance of the reference hearing in this matter, and in that estimate it took the position that the actual cash value of the State Building is $1,026,283.15. *Ex. 25* at pg. 21.

**RESPONSE:  Agreed only that the figure appears in *Exhibit 25*, but the point is moot in light of the parties' stipulation as to the valuation of the "State Building" in lieu of reference.  *See* Henlin Dec., Ex. V (filed herewith).  The statement mischaracterizes the estimate as a "second estimate" because the report at *Exhibit 9* was not prepared for reference, which was first demanded on May 27, 2021, approximately one month after *Exhibit 9* was prepared.  *See* ECF No. 29-2, ¶ 35; ECF No. 29-3, Answer ¶ 35.**

83.     The Policy's Ordinance or Law coverage states in relevant part:

I.  **Ordinance or Law**

Under this Additional Coverage, we will not pay any costs due to an ordinance or law that you were required to comply with before the loss, even when the building was damaged, and with which you failed to comply.

…

2.  Coverage B — Demolition Cost Coverage

If a Covered Cause of Loss occurs to covered Building property, we will pay the cost to demolish and clear the site of undamaged parts of the property caused by enforcement of building, zoning or land use ordinance or law.

The Limit of Insurance for Demolition Cost Coverage is $500,000 (in addition to the Building Limit).

*Ex. 1* at pg. 167.

**RESPONSE:  Agreed.**

84.     Following the loss, on March 31, 2021, the Brockton Building Inspector wrote to BAS and confirmed that the City of Brockton building department determined on the date of the

fire "that the remains of the building would need to be razed do [sic] to the condition of the building" and that the March 31, 2021 email served as an order regarding the same. *Ex. 8* at pg. 4.

**RESPONSE:  Agreed.**

85.     BAS complied with that order and demolished and razed the building. *See* Invoice for demolition attached as *Exhibit 26*; *Ex. 17* at pgs. 80 – 92 (showing demolition in process and demolition completed).

**RESPONSE:  Agreed.**

86.     The cost of that demolition was $175,420. *Ex. 26.*

**RESPONSE:  Agreed.**

87.     Philadelphia has conceded that if the fire loss is covered, "there would be coverage for the demolition of the property that was ordered by the City of Brockton." *Ex. 4* at pg. 123.

**RESPONSE:  Agreed.**

88.     BAS has never proffered an interpretation of what buildings it believes were covered under the Policy. *Ex. 5* at Answer 14.

> **RESPONSE:  PIIC is uncertain how to respond to this statement.  Read literally, PIIC agrees: BAS has never proffered an explanation of what buildings it believes were covered under the Policy.  Until August 3, 2021, the date of Susan Rodrigues' examination under oath, BAS steadfastly maintained that the "State Building" was Building No. 4 on the Policy.  *See* ECF No. 32, ¶ 78.  Since that date, BAS has maintained that the "State Building" was Building No. 5 on the Policy, or otherwise refused to identify which building it is on the Policy.  *See*, *e.g.*, ECF No. 29-19, Response No. 10 (asking BAS to state the basis for its contention that the "State Building" is insured).**
>
> **This statement, however, appears to have a typographical error, because the memorandum of law (ECF No. 28) cites this paragraph for the proposition that *PIIC* has never proffered an interpretation of what buildings it believes were covered under the Policy.  That statement is willfully false, deceptive, and wrong:**

- **PIIC explained which buildings it believed were scheduled for coverage on the Policy in its letter dated August 13, 2021, which BAS has cited in this statement and has independently furnished to the Court.** *See* **ECF No. 29-6.**

- **PIIC has steadfastly explained that it insured precisely what BAS asked it to insure: the buildings that were inspected and photographed by AssuredPartners, identified by Ward Bennett in June 2018, and verified that year and in each successive year by George Carney.** *See* **ECF No. 29-5, Response No. 14;** *accord* **ECF No. 32, ¶¶ 61-71 (including exhibits and deposition testimony referenced therein).**

- **In fact, each of the buildings described by Mr. Bennett, except Building No. 5, were identified with certainty by Joe Cappucci, who handled the insurance applications for the Policy for BAS.** *See* **ECF No. 32, ¶ 74 and cited deposition testimony (identifying Building 1 as the grandstand, Building 2 as the fair office, Building 3 as an electrical generator, Building 4 as the "chicken man" building, Building 6 as the restroom, and Building 7 as the caretaker's cottage).**

- **AssuredPartners' file demonstrates that Building No. 5 was a metal storage shed, located adjacent to a cell phone tower.** *See* **ECF No. 32, ¶¶ 50, 52. A comparison of the written descriptions and photographs provided by AssuredPartners shows that Building No. 5 appeared on Mr. McCormack's report at** *Location 32*. *See* **ECF No. 29-9, at 2-3, 212-216. The building also appears in the survey submitted to this Court by BAS.** *See* **ECF No. 15-12 (25 pages). The "State Building" is a very different building, located clear across the Fairgrounds.**

\*     \*     \*

Respectfully submitted,

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

By its attorneys,

SULLOWAY & HOLLIS, P.L.L.C.

By:     */s/ David W. Zizik*
David W. Zizik (BBO # 540780)
40 Westminster Street – Suite 201
Providence, Rhode Island 02903
(401) 421-1238 telephone
(781) 658-2532 facsimile
dzizik@sulloway.com

-and-

By:      */s/ Alexander G. Henlin*
Alexander G. Henlin (BBO # 660474)
9 Capitol Street
Concord, New Hampshire 03301
(603) 223-2800 telephone
(603) 226-2404 facsimile
ahenlin@sulloway.com

Dated: February 18, 2022

## Certificate of Service

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, on this 18th day of February 2022.

*/s/ David W. Zizik*_____
David W. Zizik (BBO # 540780)