UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| BAS HOLDING CORP. | ) |
| Defendant/Counterclaim Plaintiff | ) |

CA No. 1:21-cv-11572

**BAS HOLDING CORP.'S OPPOSITION TO PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

BAS Holding Corp. ("BAS") opposes Philadelphia Indemnity Insurance Company's ("Philadelphia's") motion for summary judgment. As grounds in support BAS states:

I.   Philadelphia's motion fails for the reasons set forth in BAS' summary judgment filings. ECF 27, 28, and 29;

II.  Philadelphia's explicit concessions that (1) there is "simply no ambiguity" in the Philadelphia policy number PHPK2149023 (the "Policy"), and (2) nothing in the Policy leads "to the conclusion that the State Building was not Building No. 2, 4, 5, or 6 under the terms of the Policy" resolves the dispute in BAS' favor;

III. Philadelphia's argument to avoid coverage for the State Building fails because it depends on multiple incorrect statements of Massachusetts law regarding insurance policy interpretation;

IV.  Philadelphia cannot meet the burden necessary to reform the Policy;

V.   BAS complied with its duty to cooperate under the Policy as it attended its examination under oath and did not refuse to provide any information to Philadelphia which was required of it under the Policy;

VI.  Philadelphia has not opposed BAS' argument that, based on the Policy's language, the coinsurance condition is not applicable to this claim.

VII. Philadelphia cannot meet its burden to demonstrate that the vacancy exclusions applies to bar coverage; and

VIII. BAS' c. 93A claim should proceed to trial.

2258973.v1

## I.   PHILADELPHIA'S MOTION SHOULD BE DENIED FOR THE REASONS SET FORTH IN BAS' MOTION FOR SUMMARY JUDGMENT.

BAS incorporates by reference its Motion for Summary Judgment, memorandum of law in support of its Motion for Summary Judgment, and its Rule 56.1 Statement of Facts and exhibits thereto, into this memorandum. ECF 27, 28, and 29.

## II.   PHILADELPHIA'S EXPLICIT CONCESSIONS THAT (1) THERE IS "SIMPLY NO AMBIGUITY" IN THE POLICY AND (2) NOTHING IN THE POLICY'S LEADS "TO THE CONCLUSION THAT THE STATE BUILDING WAS NOT BUILDING NO. 2, 4, 5, OR 6 UNDER THE TERMS OF THE POLICY" RESOLVES THIS DISPUTE IN BAS' FAVOR.

Philadelphia concedes in its Opposition that "[t]here is simply no ambiguity" in the Policy. ECF 26-1 at pg. 12. When combined with its prior concession that there is nothing "in the Policy which would lead [it] to the conclusion that the State Building was not building no. 2, 4, 5, or 6 under the terms of the Policy," ECF 29 ¶16, it is established that the State Building was covered under the Policy.

Philadelphia's Opposition suggests, contrary to its binding testimony, that in fact the State Building does not fit within the Policy's grant of coverage because it was a "masonry structure" and not a "frame" building. ECF 37 at pg. 5. This argument fails for multiple reasons. First, Philadelphia's own adjuster has acknowledged in its repair estimate that the State Building is comprised, in part, of frame construction. See Response to Philadelphia's Statement of Fact ("RPSF") ¶9 citing ECF 29-25. Second, the post-loss photographs provided to Philadelphia by its adjuster depict the framed nature of the building, including its roofing system. ECF 29-17 at pgs. 55-56, 63-65. Third, Philadelphia's suggestion that it relied on Ward Bennett's June 19, 2018 email to write the Policy is belied by its inclusion of the word "frame" with respect to buildings 4, 5, and

2

6, as Mr. Bennett did not describe any of those buildings as "frame" buildings (nor did BAS describe any of the buildings as being "frame" in any of their statements of values). Fourth, BAS is bound by the testimony of its 30(b)(6) deponent who has already conceded that there was nothing in the Policy which would lead to the conclusion that the "State Building was not building no. 2, 4, 5, or 6 under the terms of the Policy." ECF 29 ¶16.

### III. PHILADELPHIA'S ARGUMENT TO AVOID COVERAGE FOR THE STATE BUILDING FAILS BECAUSE IT RELIES ON MULTIPLE INCORRECT STATEMENTS OF MASSACHUSETTS LAW REGARDING INSURANCE POLICY INTERPRETATION.

Philadelphia's memorandum of law in support of its motion for summary judgment does not quote, summarize, address, or even consider the language of the Policy to support its argument that the State Building was not insured under the Policy. See ECF 33 at pgs. 7 - 13. Rather, Philadelphia cites to several cases which are either inapposite, or support BAS' position, in an attempt to avoid its obligations under the Policy.

First, Philadelphia's summary judgment memorandum claims, without legal citation, that it is BAS' burden to demonstrate by "clear and unequivocal evidence" that State Building fails within the Policy's grant of coverage. ECF 33 at pg. 8. Philadelphia's claim is unsupported by any citation to legal authority because it is wrong.[1] However, even if that was the proper burden, it has been met as the parties have agreed that the State Building fits within the Policy's description of the insured property. ECF 29 at ¶16.

Second, Philadelphia relies on a litany of case law, none of which involves the

---

[1]    In its Opposition Philadelphia provides a see citation to Epstein v. Northwestern Nat'l Ins. Co., 267 Mass. 571, 574 (1929) to support this claim. Epstein says nothing of the sort.  Id.

interpretation of insurance policies, to support its incorrect position that one is permitted to consider extrinsic evidence to create an ambiguity in the Policy that does not exist based on the Policy's plain language. ECF 33 at pgs. 8 – 9 *citing* Affiliated FM Ins. Co. v. Constitution Reins. Corp., 416 Mass 839 (1994) (interpreting factultative reinsurance certificate); Keating v. Stadium Mgt. Corp., 24 Mass. App. Ct. 246 (1987) (interpreting employment agreement); Robert Indus., Inc. v. Spence, 362 Mass. 751 (1973) (interpreting lease).

Philadelphia cites Affiliated FM Ins. Co. v. Constitution Reins. Corp., 416 Mass. 839 (1994) for the proposition that when an "insurance policy is in any respect uncertain in meaning, all the circumstances of the parties leading to the formation of the contract may be shown for the purpose of elucidating its terms." ECF 33 at pg. 8. However, Affiliated did not involve interpretation of an insurance policy, it involved the interpretation of a facultative reinsurance certificate, and the Court explicitly acknowledged that in interpreting that reinsurance certificate it was not bound by the rule of *contra preferentum*. See and compare Affiliated 416 Mass. at 844-45 with Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280 (1997)("Where there is more than one rational interpretation of policy language, 'the insured is entitled to the benefit of the one that is more favorable to it."). Further, in Affiliated the SJC held that, the ambiguity in the subject contract was a question of fact and remanded the case to the Superior Court for trial. In contrast, as both parties have acknowledged, "[t]he proper interpretation of an insurance policy is a matter of law to be decided by a court." Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012).

Philadelphia's citation to <u>Keating</u> for the premise that "the language in a contract need not be ambiguous on its face in order to admit extrinsic evidence" is likewise incorrect when interpreting insurance policies. 24 Mass. App. Ct. at 246-49. To the contrary, "[w]hen deciding whether a term is ambiguous [in an insurance policy], [courts] initially do not consider any extrinsic evidence of the intended meaning.[] Instead, we look 'both to the contested language and to the text of the [insurance policy] as a whole." <u>Dorchester Mut. Ins. Co. v. Krusell</u>, 485 Mass. 431, 438 (2020) (citation omitted). Additionally, <u>Keating</u> was an appeal following a jury trial, in which a judge made findings of fact upon which he relied to interpret the employment contract at issue in this case, which, as noted, is not how insurance policies are interpreted. <u>Boazova</u>, <u>supra</u>.

Third, in its Opposition, Philadelphia suggests that the BAS' citation to the SJC's decision in <u>Hakim</u> for the proposition that "where there is more than one rational interpretation of policy language, 'the insured is entitled to the benefit of the one that is more favorable to it.'," is an attempt by BAS to "appl[y] a legal standard never before recognized or applied in Massachusetts." ECF 37 at pg. 4. Again, Philadelphia is wrong. This standard has been recognized and applied in Massachusetts for decades. <u>Hakim</u>, <u>supra</u>; <u>Trustees of Tufts Univ. v. Commercial Union Ins. Co.</u>, 415 Mass. 844, 849,(1993); <u>Hazen Paper Co. v. United States Fidelity & Guar. Co.</u>, 407 Mass. 689, 700 (1990).

Fourth, in its Opposition – apparently aware that its coverage position fails under Massachusetts law – Philadelphia makes up a new argument. It now argues, for the first time, that the "terms of the Policy applications and representations about the buildings to be insured merged into the Policy itself." ECF 37 at pg. 10. This is patently incorrect.

5

In support of this argument, Philadelphia cites to its responses to the Plaintiff's statement of facts at ¶¶12 and 14, which responses make the same conclusory assertion, and in turn, cite to other filings in which Philadelphia made the same conclusory assertion. Like many of Philadelphia's arguments, this suggestion is not supported by the Policy or any case law. In fact, the Policy's language explicitly defeats this new theory.

When the Policy intends to have extrinsic evidence merged into the Policy, or wishes to make Philadelphia's reliance on a policyholder's representations a part of the Policy, the Policy language does so explicitly. See ECF 29-1 at pg. 194-195, 303 (Adding a condition to the "**SECTION IV** - **COMMERCIAL GENERAL LIABILITY CONDITION**" and the "**SECTION IV – LIQUOR LIABILITY CONDITIONS**" which states that the statements in the Declarations are based upon representations BAS made to Philadelphia and that Philadelphia relied on those representations); 282 (Adding language to the Cyber Liability Endorsement that "[i]n consideration of the payment of the premium and in reliance upon all statements and information furnished to [Philadelphia] including all statements made in the application, its attachments and the material incorporated therein, which are incorporated herein and deemed to be a party of this policy" Philadelphia provides the liability coverage set forth therein).

Philadelphia included no such "conditions" or other language merging extrinsic documents or representations into the Policy's property coverage in the **COMMON POLICY CONDITIONS** form, the **Loss Conditions** or **Additional Conditions** in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**, the **COMMERCIAL PROPERTY CONDITIONS**, or any other portion of the Policy which applies to the

Policy's building coverage at issue in this case. ECF 29-1 at pgs. 94, 111-115, and 118.

The inclusion of language in the liability coverages which incorporates extrinsic documents and representations into those coverages, ECF 29-1 at pgs. 194-195, 282, 303, definitively establishes that such extrinsic evidence is **_not_** merged into the Policy's property coverages. If, as Philadelphia suggests, the "terms of the Policy applications and representations about the buildings to be insured merged into the Policy itself" automatically, then there would be no need for Philadelphia to add explicit language to the liability coverages adding conditions to accomplish that goal. To ignore the distinction between Philadelphia's inclusion of such language in the liability coverages, and lack of such language in the property coverages, would create an impermissible surplusage in the Policy's language. Computer Sys. of America, Inc. v. Western Reserve Life Assur. Co. of Ohio, 19 Mass. App. Ct. 430, 437 (1985)("every word and phrase of a contract should, if possible, be given meaning, and ... none should be treated as surplusage if any other construction is rationally possible.").

Fifth, Philadelphia argues that the rule of _contra preferentum_ with respect to insurance policies _only_ applies to exclusions, but not to other portions of the Policy. ECF 33 at pg. 12. As a threshold matter, Philadelphia's characterization of decades of SJC case law regarding insurance policy interpretation as a "loose rule of construction," ECF 33 at pg. 17, is wrong. Further, although the _contre preferentum_ rule applies "with particular force to exclusionary provisions," it is always the case that "[w]hen the policy language is ambiguous, 'doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured.'." Boazova v.

2258973.v1

Safety Ins. Co., 462 Mass. 346, 350-351 (2012).

Sixth, Philadelphia cites to Vermont Mut. Ins. Co. v. Carreau, in support of its argument, despite the fact that Carreau supports BAS' position. 2009 U.S. Dist. LEXIS 148371 (D. Mass. Apr. 15. 2009). In Carreau the insurance policy at issue had a schedule of locations that listed three "ONE FAMILY DWELLINGS" at 532, 534, and 536 Federal Furnace Road, Plymouth, Massachusetts. Id. at *4-5.  A drowning death occurred at the "Ellis Haven Family Camping & Picnic Grounds is located at 531 Federal Furnace Road, Plymouth, Massachusetts" which consisted "over four hundred campsites and cabins, restroom, shower and laundry facilities, a grocery store, restaurant and sports bar." Id. at *5. The Court concluded that "[t]he Policy is unambiguous" because it provided "commercial liability for three one-family dwellings, none of which are located at the campground address" and there was "nothing in the policy declarations to even hint that coverage was intended to extend to a more than 400 campsite operation at a different address... ." Id. In contrast, the parties agree that the State Building fits within the Policy's coverage grant. ECF 29 at ¶16

In sum, Philadelphia's desperate attempt to avoid the well-established rules of Massachusetts insurance policy interpretation fails with the result that the State Building is insured under the Policy as a matter of law.

## IV.   PHILADELPHIA CANNOT MEET THE HIGH BURDEN NECESSARY TO SEEK REFORMATION OF THE POLICY.

In a further attempt to avoid the clear language of the Policy and BAS' rational interpretation of the Policy, Philadelphia asks the Court to ignore the language of the Policy, and instead reform the Policy to exclude the State Building from coverage. ECF

8

33, 37. Ironically, Philadelphia suggests that it is BAS who is asking the court to "reform the policy." ECF 33 at pg. 6. The opposite is true. BAS' argument is based on an analysis of the Policy's language as written. Philadelphia is the one who seeks to have the Court ignore and/or alter the terms of the Policy to include language from extrinsic sources.

To avoid summary judgment on its reformation theory Philadelphia must be able to "demonstrate that a trier of fact could reasonably" conclude that Philadelphia can "present[] full, clear, and decisive proof" that the parties "reached an agreement" as to the terms of the Policy, and those terms were not included in the Policy. Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 756 (1993); Borges ex rel. S.M.B.W. v. Serrano—Isern, 605 F.3d 1, 5 (1st Cir. 2010). It cannot meet this burden.

Philadelphia cannot meet this burden first and foremost because Joseph Cappucci and Sue Rodrigues, the two people in charge of placing insurance for BAS testified that they "expected" and "assumed" that the State Building *would* be covered. SOFO[2] ¶1 (Mr. Cappucci "expected to be covered" were "the buildings at the fairground… the grandstand building; the office building; … the building where we have our exhibits … our largest restroom… the state building; the house"); ECF 29-18 at 42:7-15 (Ms. Rodrigues testifying "I would absolutely assume that one of the buildings [on the Statement of Values] would be the State Building because it's the biggest building we – one of the largest we have on the property"). There cannot be "full, clear, and decisive proof" of an agreement, when one party to the agreement disputes the purported agreement.

Logically, Philadelphia's position makes no sense. Following the loss, Philadelphia's

---

[2]    "SOFO" refers to BAS' Statement of Facts in Opposition to Philadelphia's Summary Judgment Motion.

own adjuster went to the Property, measured all the buildings, and estimated the values of all the buildings. ECF 29-5. Philadelphia's adjuster estimated that the State Building was the second most valuable building on the property - with a replacement cost value over three times more than the third most value building - and was third largest structure on the Brockton Fairgrounds. ECF 29-9 at pg. 3, 260-61. It defies logic to suggest that BAS did not intend to insure its second most valuable building on the property.

Philadelphia's own investigation and ever changing positions further demonstrates that it cannot "present[] full, clear, and decisive proof" that the parties "reached an agreement." Upon receipt of the loss notice, Matthew Roberts, the adjuster in charge of the claim, undertook an investigation into the loss. SOFO ¶2. At no point in its claim notes, and to BAS' knowledge nowhere during the history of the claim, did Philadelphia analyze the language of the Policy to determine whether the State Building fit within the Policy's coverage grant. SOFO ¶3. Rather than acknowledge its obligations, Philadelphia went on a month's long tortured analysis in which it reached ever-changing, but never correct, positions to attempt to justify its refusal to pay this claim.

On March 26, 2021, Mr. Roberts enter a claim note stating that he had "pulled the original application, showing the building does not appear to be scheduled." SOFO ¶3. In his deposition, Mr. Roberts admitted that he was referring to the "original application from when BAS first insured with Philadelphia." ECF 29-4 at pg. 53. The original application, however, referred to 25 buildings – not 7. SOFO ¶6. At his deposition, Mr. Roberts agreed that the original application was therefore irrelevant to his analysis of whether coverage existed. ECF 29-4 at pg. 53.

10

Later that morning same, Mr. Roberts sent an email to his boss indicating that it was his opinion that the State Building was not insured under the Policy because he "didn't see that this building [was] scheduled on our policy." ECF 29-4 at pg. 64; SOFO ¶7. Mr. Roberts testified that this belief was based on news footage, the fact that BAS referred to the building as the "Old State Building," the fact that the Policy did not use the words "Old State Building," and the statement of values did not use the "Old State Building." ECF 29-4 at pgs. 64-65.

Mr. Roberts then enlisted the help of Jessica Dolce, the sole underwriter assigned to the BAS account, to assist in his attempts to disclaim coverage for the State Building. SOFO ¶8. On April 7, 2021, Ms. Dolce forwarded all materials submitted on BAS' behalf to Philadelphia regarding renewals of insurance policies for the policy years 2012 – 2020 to herself for review and analysis. SOFO ¶9. Ms. Dolce testified that she reviewed "everything [she] could to see if a building of that age and that type was ever reported to [Philadelphia]." SOFO ¶10.

On April 8, 2021, Ms. Dolce wrote to Mr. Roberts and attached all of the prior years' application forms and communications – including the June 19, 2018 email of Ward Bennett. Ms. Dolce wrote to Mr. Roberts and stated:

> Per our conversation and review of the applications/SOVs in the file, I do not feel the "State Building" was ever reported to us for coverage. SOVs for all years with the exception of 2016 are attached to this email. Over the years the building was reported as "storage", "support", and "exhibit". An exhibit building from our underwriting standpoint for a fair/fairground is a building in which exhibitions take place such as a 4-H, various livestock shows, etc. It would not be a vacant building used as a type of "art" or "history" exhibit.

SOFO ¶12. Nowhere in Ms. Dolce's analysis did she suggest that Mr. Bennett's June 19,

11

2018 email – which was not a part of the policy, was not signed by the insured, and was

not part of any application for insurance – was relevant to her coverage analysis in April

of 2021. SOFO ¶14.[3]

On April 30, 2021, Philadelphia's adjuster provided Philadelphia with a detailed list

of buildings and measurements which established that – even if Philadelphia was to rely

on Mr. Bennett's June 19, 2018 email - the State Building *had* to be one of the buildings

insured under the Policy. Specifically, Philadelphia's adjuster identified:

(1)     Four structures that were "Open Covered Spaces" and accordingly not
        "buildings" within the terms of the Policy. ECF 29-9 at pg. 3 identifying buildings
        17, 26, 30, and 31 as "Open Covered Spaces";

(2)     Three structures that were "sheds", and accordingly not "buildings" within the
        terms of the Policy as they would be subject to a different grant of coverage
        for "Garages/Storage Sheds." ECF 29-9 at pg. 3 and 77 identifying buildings
        15, 19, 32, and 33 as "sheds"; ECF 29-1 at pgs. 163-64;

(3)     One "garage," which was not a "building" within the terms of the Policy as it
        would be subject to a different grant of coverage for "Garages/Storage Sheds.".
        ECF 29-9 at pg. 3 identifying building 16 as a "Maintenance Garage."; ECF 29-
        1 at pgs. 163-64;

(4)     Nine concession stands, which it is undisputed were not insured under the
        Policy. ECF 29-9 at pg. 3 identifying buildings 29, 28, 27, 25, 24, 23, 21, 20,
        18. SOFO ¶17; and

(5)     Seven "barns." ECF 29-9 at pg. 3 identifying buildings 8, 9, 10, 11, 12, 13, and
        14 as "barns."). Neither party has ever suggested that any "barn" was insured
        under the Policy;

(6)     Two restrooms, one of which necessarily was the restroom insured under the
        Policy. ECF 29-9 at pg. 3 identifying buildings 6 and 22 as restrooms.

That leaves five buildings (in addition to one of the two restrooms) that could be insured

---

[3]      Neither Ms. Dolce, nor Mr. Roberts, nor anyone at Philadelphia ever considered Mr. Bennett's June
19, 2018 relevant to their investigation of whether coverage existed for the State Building until "counsel
found" the June 19, 2018. ECF 29-4 at pg. 107.

under the Policy: (1) the grandstand, (2) the office, (3) the dwelling, (4) the building referred to by Philadelphia's adjuster as the "Storage" building, and (5) the State Building (referred to as the "Exhibit Bldg" by Philadelphia's adjuster). ECF 29-9 at pg. 3.

Philadelphia was also aware, after receipt of its adjuster's report, that at a minimum there were some inconsistencies between the information provided in Mr. Bennett's June 19, 2018, email and its adjuster's measurements of the buildings. Below is a comparison of the buildings described by Ward Bennett's emails and the findings of Philadelphia's own adjuster regarding buildings on the Property:

| Bldg. | Bennett's email | McCormack's report |
|---|---|---|
| 1 | 25,000 square foot grandstand built in 1965. ECF 29-6 at pg. 13 | 42,649 square foot grandstand built in 1931. ECF 29-9 at pgs. 3 and 228 |
| 2 | 2000 square foot office building built in 1970. ECF 29-6 at pg. 13 | 2,959 square foot office building built in 1931. ECF 29-9 at pg. 3 and 246 |
| 4 | 850 square foot exhibit building built in 1960. ECF 29-6 at pg. 13-14 | 8,849 square foot Exhibit Bldg built in 1931. ECF 29-9 at pg. 3 and 259. |
| 5 | 1,250 square foot storage building built in 1980. ECF 29-6 at pg. 14. | 3,276 square foot storage building built in 1931. ECF 29-9 at pgs. 3 and 4. |
| 6 | 800 square foot restroom built in 1965. ECF 29-10 | 3,990 square foot restroom built in 1931. ECF 29-9 at pgs. 3 and 9. |

Notwithstanding this, Philadelphia denied the claim on August 13, 2021, in part based on its position that Mr. Bennett's June 19, 2018, email "described the Buildings covered under the Policy." ECF 29-6. Philadelphia was aware that this statement was inaccurate at the time it was made.

Philadelphia has never explained what actual buildings it claims to have insured on the Property, other than the grandstand and the dwelling. It explicitly admitted as much in its 30(b)(6) deposition. ECF 29-4 at pg. 42. Despite this concession, in its Opposition Philadelphia persists with suggesting that it *has* explained to BAS what it

2258973.v1

believes to be covered by reference to "what Mr. Bennett described in words and photographs"[4] to PIIC. ECF 37 at pg. 12.

Shortly after the denial letter was issued, counsel for BAS asked Philadelphia to "identif[y] the building which it contends it was accepting premium to insure under the 18-19 Policy." SOFO ¶15. Philadelphia never responded to this inquiry. In discovery, BAS gave Philadelphia another opportunity to explain what buildings it contended was insured under the Policy. ECF 29-5 at 14. Philadelphia has never identified actual buildings it contends it insures, aside from the grandstand and dwelling.

Philadelphia sought further information from Mr. Bennett and AssuredPartners in discovery to attempt to meet its burden to present "full, clear, and decisive proof" that the parties "reached an agreement" that was not incorporated into the Policy. Polaroid, 414 Mass. at 756. However, those efforts made things less, not more, clear.

Philadelphia represented to the Court that prior to the issuance of the 2018-2019 Policy Mr. Vanderwerker of AssuredPartners "traveled to Brockton and met with Maura Carney, the daughter of BAS' owner, and walked around the Fairgrounds," ECF 33 at pg. 3. That claim is not supported by the evidence. Philadelphia claims, based primarily on the testimony of Mr. Bennett, that Mr. Vanderwerker took measurements and pictures of the buildings that BAS wanted to insure. Id. However, the only evidence of any photographs taken by Mr. Vanderwerker are two photographs of the grandstand and one other photograph which depicted a maintenance garage, a cellphone tower, and two mechanical sheds. See and compare ECF 35-18 at pg. 6-8. Further, Mr. Bennett conceded

---

[4]     Mr. Bennett provided only one photograph to Philadelphia, a picture of the dwelling which the parties do not dispute was insured under the Policy. ECF 35-17 at pg. 7.

in his deposition that he was not certain about whether the photographs he was thinking of were of the Brockton Fairgrounds or for another property owned by BAS. RPSOF ¶70.

Philadelphia now definitively claims that the maintenance garage or, as Philadelphia now describes it, the "white, metal storage shed with a red roof" depicted in the photograph sent by Mr. Vanderwerker to Mr. Bennett was insured under the terms of the Policy as Building No. 5. ECF 37 at pg. 5 referring to ECF 35-18 at pg. 6. This theory fails for multiple reasons. First, the Policy has a separate grant of coverage for "storage sheds" on the Property. ECF 29-1 at pgs. 163-164. Accordingly, to the extent coverage existed for this storage shed, it would be afforded under that grant of coverage. Second, Philadelphia's entire theory is premised off its position that Mr. Bennett's June 19, 2018 email described the buildings insured under the Policy. This storage shed it now claims is covered is twice as big and ten years older than what was referenced by Mr. Bennett.

In short, Philadelphia cannot meet its burden to sustain its reformation theory. It has not, and cannot, "demonstrate that a trier of fact could reasonably" conclude that Philadelphia "presented full, clear, and decisive proof" that the parties "reached an agreement" as to the terms of the Policy which did not include coverage for the State Building. Polaroid Corp. v. Travelers Indem. Co., 414 Mass. at 756 (1993).

## V.   BAS DID NOT FAIL TO ATTEND ANY EXAMINATION UNDER OATH AND DID NOT REFUSE TO PROVIDE ANY INFORMATION TO PHILADELPHIA.

Philadelphia claims that BAS refused "to provide basic information about the claim under oath." That is not true. It attended the examination under oath on August 3, 2021 at which it answered all questions asked of it. ECF 29-18. It also provided 739 documents in response to a litany of requests from Philadelphia.

Philadelphia claims that BAS "adopted a purposefully adversarial posture against PIIC, and antagonistically challenged PIIC's requests as being groundless." ECF pg. 20-21. That is not true. Rather, when faced with Philadelphia demanding to take six additional examinations under oath of specific individuals, none of which were authorized by the Policy's plain language, BAS explained its position to Philadelphia. ECF 28 at pgs. 13-16. Philadelphia's 30(b)(6) witness explicitly agreed with BAS' positions. Id. Thereafter, Philadelphia did not provide any substantive response to the Policy interpretation issues raised by BAS, rescheduled the examinations for dates on or after August 19, 2021, and then denied the claim before those examinations were scheduled to take place. ECF 28 at pg. 15-16. Philadelphia cannot have suffered the "substantial and material" prejudice it now claims to have suffered *before* denying the claim on August 13, 2021, for examinations that were not scheduled to take place until August 19, 2021.

## VI.   PHILADELPHIA HAS NOT OPPOSED BAS' ARGUMENT THAT, BASED ON THE POLICY'S LANGUAGE, THE COINSURANCE PROVISION IS NOT APPLICABLE TO THIS LOSS.

BAS' motion for summary judgment argues that based on the plain language of the Policy and Massachusetts case law, the Coinsurance Condition's language referring to "the value of Covered Property at the time of loss," meant the actual cash value of the loss. ECF 28 at pgs. 16-19. Rather than address BAS' interpretation of the Policy's use of the phrase "value of Covered Property at the time of loss," or address the language of the Coinsurance condition at all, Philadelphia mischaracterizes BAS' argument, and simply states that because other portions of the Policy permit BAS to seek replacement cost coverage, coinsurance should be calculated using replacement cost. Because Philadelphia

has not provided any argument to refute BAS' proffered policy analysis, and because even if Philadelphia had done so, BAS' analysis is "rational," BAS is entitled to its interpretation and the Court should rule that the Coinsurance Condition does not apply to limit its recovery for this loss. Hakim, supra.

## VII.   PHILADELPHIA CANNOT MEET ITS BURDEN TO DEMONSTRATE THAT THE VACANCY EXCLUSION APPLIES TO BAR COVERAGE.

Philadelphia incorrectly suggests that BAS has a burden to demonstrate that an "exception to an exclusion" applies. ECF 33 at pg. 19. There is no "exception" to the Vacancy exclusion. ECF 29-1 at pg. 120. The exclusion includes a definition of the term "vacant," which speaks to Philadelphia's burden, not BAS'.  ECF 29-1 at pg. 120.

Philadelphia's argument also rests, on its contention that "[n]o one from BAS had been inside the state building for at least nine months before the fire." ECF 33 at pg. 19. Philadelphia has conceded that Brian Ferreira, who performs maintenance for BAS, was in the State Building within "a month or so" before the fire. ECF 38 at ¶53.

Philadelphia also relies on a litany of evidence which is not relevant to the inquiry of whether the building was vacant or unoccupied under the terms of the Policy. ECF 33 at pg. 7. Philadelphia does not get to decline coverage for a building because it does not approve of its policyholder's graffiti removal policy or its manner of securing a building, unless that is required by the Policy's language. Notably, the Policy does have language indicating that, at times, Philadelphia issues policies of insurance which require automatic burglary alarms or other safeguards to an insured property. ECF 29-1 at pg. 23. However, no such terms or conditions applied to the Policy here. The issues here are whether the State Building was occupied for its intended purposes and contained enough business

17

personal property for BAS to conduct its customary operations. ECF 38 ¶55; ECF 29-1 at pg. 120. The answer to both questions is yes.

BAS at all times used the State Building to store lumber, cow panels, trash barrels, signage related to the 4-H exhibit at the Brockton Fair, signage that was used for parking at the Brockton Fair, fencing that was to be installed at the Forest Avenue side of the Brockton Fairgrounds in the State Building, and other materials used at the Brokcton Fair. See RPSF ¶6. The State Building was therefore occupied for its intended purposes and contained enough business personal property for BAS to conduct its customary operations as a seasonal fair. Philadelphia cannot "demonstrate that a trier of fact could reasonably" conclude that the "Vacancy or Unoccupancy" exclusion applies to bar BAS' claim. Borges, 605 F.3d at 5.

## VIII.  BAS' c. 93A CLAIM (COUNT III) SHOULD PROCEED TO TRIAL.

The record demonstrates that Philadelphia violated several subsections G.L. c. 176D, §3(9). Although a violation of G.L. c. 176D is not a *per se* violation G.L. c. 93A, §11, each such violation can be evidence of an unfair or deceptive act or practice under §11. Brazas Sporting Arms. Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 9 (1st Cir. 2000) ("conduct that violates ch. 176D may independently be an unfair trade practice actionable under ch. 93A, § 11"). Given the number and nature of Philadelphia's violations of G.L. c. 176D, §3(9), as well as its other conduct, genuine issues of material fact exist as to whether such violations were unfair or deceptive acts or practices under G.L. c. 93A, §2 and therefore actionable under G.L. c. 93A, §11.

Given that the doctrine of *contra preferentem* applies to this insurance coverage

dispute, liability has been reasonably clear since BAS' presented its "rational interpretation" of the Policy entitling it to coverage. Once BAS' "rational interpretation" was presented to Philadelphia, it did not matter if Philadelphia could present a second "rational interpretation" of the Policy because BAS was entitled to the interpretation "more favorable to it." Hakim, 424 Mass. at 281–82. At that point, Philadelphia was required to effectuate prompt, fair and equitable settlement of the claim, and its failure to do so violated G.L. c. 176D, §3(9)(f).

This case differs from the cases in which an insurer was held liable for a contract dispute with its insured, but not liable under c. 93A as a matter of law, in a context where the parties were not guided by existing case law or involved "vexing questions." See Bos. Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7 (1989); Riley v. Aetna Life and Cas. Co., 31 Mass. App. Ct. 910 (1991).

Here, there was no lack of "applicable precedent" or "vexing questions [that were] the subject of a considerable number of cases." To the contrary, the case is readily resolved by applying well-established tenets of insurance policy interpretation under Massachusetts law to the plain language of the Policy. Philadelphia's continued refusal to acknowledge the decades old rules of policy interpretation, and instead compelling BAS to litigation, are precisely the type of "extortionate tactics" for which insurance companies should be held liable under c. 93A. Philadelphia's failure to address, or even attempt to respond to, BAS' coverage arguments related to the Policy's examination under oath or coinsurance conditions, provides further evidence of bad faith. An insurer is not entitled to decline coverage, or apply policy conditions, simply because it wishes to.

19

Philadelphia's conduct in litigation and its claims handling establish several other facts from which a finder of fact could conclude Philadelphia was liable under c. 93A.

- Philadelphia filed a motion for preliminary injunction which was not supported by a verified complaint, an affidavit, witness testimony, or any other verified evidence. ECF 12 and 13.  Such frivolous litigation tactics are evidence of an "absence of good faith." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 41 n. 5 (1st Cir.2000)("It is settled law that conduct during litigation can constitute a 93A violation.")

- In the first few months investigating the claim, Philadelphia did not consider whether the State Building was any building other than building number 4 in its investigation. ECF 29-4 at pg. 98, 108-109. This myopic investigation violated Philadelphia's duty to conduct a "reasonable investigation based upon all available information." G.L. c. 176D, §3(9)(d).

- Philadelphia compelled BAS to institute litigation to recover amounts due under an insurance policy in violation of G.L. c. 176D, §3(9)(g);

- Philadelphia attempted to bully its policyholder into withdrawing its claim by threatening institute a preliminary injunction action and seek costs against its Policyholder if it chose to proceed with seeking the coverage it was owed. SOFO ¶16. This is precisely the type of "extortionate tactic" for which insurers should be penalized under c. 93A.

- Philadelphia's reservation of rights letter misrepresented the terms of the applicable vacancy exclusion, suggesting that the standard which Philadelphia would need to meet was, in fact, much lower than it truly was. See and compare ECF 10-3 with ECF 34 at pgs. 18-19 (Philadelphia acknowledging the correct policy language). This violated G.L. c. 176D, §3(9)(a).

For these reasons, BAS has demonstrated that a trier of fact could readily conclude that Philadelphia was liable to BAS under G.L. c. 93A.

## **CONCLUSION**

Wherefore, BAS requests that Philadelphia's motion be denied in its entirety, and that judgment enter in BAS' favor on all counts of Philadelphia's Complaint and with respect to Count I and II of BAS' Counterclaim Complaint.

2258973.v1

Respectfully Submitted,

BAS Holdings Corporation
By its Attorneys,

/s/ Christopher M. Reilly

_____
Date:  February 22, 2022        Christopher M. Reilly, BBO# 674041
                                SLOANE and WALSH, LLP
                                One Boston Place
                                201 Washington St., Suite 1600
                                Telephone: (617) 523-6010
                                Facsimile: (617) 227-0927
                                creilly@sloanewalsh.com

## CERTIFICATE OF SERVICE

I, Christopher M. Reilly, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Christopher M. Reilly

_____
Christopher M. Reilly

Date: February 22, 2022

21

2258973.v1